## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

MICHAEL GLASGOW and NANCY          )
GLASGOW, individually and as parents )
and next friends of R.G., a minor child, )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 )          Case No. CIV-04-254-M
                                    )
INDEPENDENT SCHOOL DISTRICT         )
NO. I-29 OF McCLAIN COUNTY,         )
STATE of OKLAHOMA a/k/a             )
BLANCHARD SCHOOL DISTRICT           )
et al.,                             )
                                    )
            Defendants.             )

## ORDER

This matter comes before the Court on the Motion for Summary Judgment filed pursuant to Rule 56, F.R.Civ.P., by the defendant, Independent School District No. I-29 of McClain County, Oklahoma, also known as Blanchard School District ("School District"). Plaintiffs Michael Glasgow and Nancy Glasgow, individually and as parents and next friends of R.G., a minor child, have responded to the motion, and the defendant has filed a reply. Based upon the record, the Court makes its determination.[1]

Certain events giving rise to this lawsuit are highly disputed. There is disagreement

---

[1]The Court is mindful that the plaintiffs have moved to strike certain exhibits attached to the School District's Motion for Summary Judgment. Resolution of that motion does not require a decision on the plaintiffs' Motion to Strike, because, as the defendant has noted, these exhibits are not determinative of its request for judgment as a matter of law. Furthermore, the Court notes that one challenged exhibit, Exhibit No. 8, is listed by the plaintiffs themselves on their exhibit list filed on December 1, 2004.

Furthermore, the Court finds resolution of the instant motion cannot wait until the defendant's Motion to Exclude Testimony and Opinions of Kathy Karmid is resolved. The plaintiffs have requested and been granted an extension of time in which to respond to such motion and in light of the pending trial, the Court finds a decision on the School District's Motion for Summary Judgment is warranted without further delay.

regarding R.G.'s allegations that D.H., also a minor, stood behind R.G. and repeatedly grabbed R.G.'s genitals, that D.H. repeatedly made movements that the parties have described as "humping motions" behind R.G. and that D.H. made sexually derogatory remarks to R.G. and told him, inter alia, that "I got me a new bitch." Deposition of R.G. (October 21, 2004) at p. 133, line 12.  The following, however, are undisputed for purposes of the instant motion.

1.  R.G., who has been diagnosed as dyslexic, attended school with D.H.

2.  While enrolled as eighth and ninth graders, D.H. threatened R.G. and threw a cup of ice at him.

3.  R.G. did not report these incidents.

4.  Prior to, and during, his tenth grade year at Blanchard High School ("Blanchard High"), R.G. observed D.H. stand behind other students and perform  "humping motions." These students complained to each other and to R.G., but they did not complain about D.H.'s behavior to school officials.

5.  On September 24, 2002, R.G. reported to a school counselor that a group of males riding in a truck yelled obscenities at him and chased after him.

6.  The counselor in turn reported the incident to defendant Glen Castle, Blanchard High principal, and on September 25, 2002, Castle called three males believed to be involved in the incident into his office.

7.  On September 25, 2002, R.G., accompanied by his mother, Nancy Glasgow, and Detective Randy Johnson,[2] a police officer employed by the City of Blanchard, met with

_____

[2]In his deposition, R.G. testified that due to embarrassment, Detective Johnson was the first person he ever told that D.H. had made "humping motions" or had grabbed his genitals.  R.G.

Castle.  At that time and for the first time, R.G. complained to Castle about a previous

incident at school involving R.G. and D.H., during which both males were partially clothed

and D.H. made "humping motions."

8.  Castle admonished  D.H. in his office in the presence of D.H.'s mother, who had

been advised of the matter.   D.H. apologized to R.G. about the truck incident, but he made

no apology about any other behavior, which he described as "a locker room prank."

Deposition of Nancy C. Glasgow (January 13, 2004) at p. 214, line 19.

9.  Both R.G. and D.H. played on the Blanchard High football team, and further

discipline was left to the football coach, who put D.H. through additional activities after

football practice and who advised D.H. that if any other complaints and/or allegations were

made, he would be removed from the football team.

10.  After that date, neither D.H. nor his friends directly threatened or harassed R.G.

D.H.'s friends indirectly threatened R.G., but these threats were not reported by R.G. to

school officials.

11.  Other students likewise taunted R.G., but again he did not complain to school

officials.  Nancy Glasgow did advise Castle that R.G. would not be participating in football.

12.  In October 2002, R.G. withdrew from Blanchard High and began attending

Dibble High School.

The Glasgows brought this action on March 9, 2004, and in their amended complaint

filed on March 26, 2004, they alleged that the School District and certain individual

defendants had violated federal and state laws.  The movant has challenged each cause

---

further testified that he told Detective Johnson that it had only happened one time.  Deposition of
R.G. (October 21, 2004) at pp.167-69.

of action.

In determining whether summary judgment is appropriate in this instance in favor of the School District on any cause of action, the Court does not evaluate the credibility of the witnesses, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ." Id. at 249.  Such matters  "are jury functions."  Id. at 255.

Rather, the Court's task at this stage is to decide "whether there is a genuine issue for trial . . . [and] there is no triable issue . . . unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).  The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," id. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

The Glasgows have first alleged that the School District violated Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., because it knew or should have known of D.H.'s inappropriate conduct and failed to take action to protect R.G. both prior to, and after, such conduct.  In particular, the Glasgows have alleged that the School District, which has not disputed that it is the recipient of federal education funding for Title IX purposes, was deliberately indifferent to R.G.'s safety and right to be free from sexual harassment before it occurred and recklessly disregarded his right to be free from further harassment after such behavior was noticed and/or reported.

Title 20, section 1681(a) of the United States Code provides in pertinent part that

4

"[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

20 U.S.C. § 1681(a).

In <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999), the United States Supreme Court found that an action for damages may lie against a school district in cases of student-on-student harassment but "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." <u>Id</u>. at 633. The Supreme Court further "conclude[d] that such action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." <u>Id</u>.

In determining liability, the Court is mindful that the entity that is named as the defendant "may be liable in damages under Title IX only for its own misconduct." <u>Id</u>. at 640. That is to say in this case, the School District may not be held liable for the actions of another, but rather may only be held liable for its own "deliberate indifferen[ce] to known acts of student-on-student sexual harassment," <u>id</u>. at 647, in one of its schools "and the harasser is under the school's disciplinary authority." <u>Id</u>.

The United States Court of Appeals for the Tenth Circuit has articulated four factors which must be proven to prevail on a claim under Title IX. The instant plaintiffs must establish that the School District

"(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."

<u>Murrell v. School District No. 1</u>, 186 F.3d 1238, 1246 (10th Cir. 1999)(citation omitted).

Under the circumstances of this case, the Court first finds Castle, as "the highest-ranking administrator at . . . [Blanchard High,] exercised substantial control of . . . [D.H.] and the . . . [Blanchard High] school environment during school hours . . . so [that] . . . [his] knowledge may be charged to the School District." Id. at 1247 (citation omitted).  In an attempt to show that Castle had actual knowledge of D.H.'s conduct, the plaintiffs have relied first upon  information obtained from an unidentified caller to the school's "Safe Call Helpline" on August 21, 2002.  The caller reported that D.H. was "completely out of control," Plaintiffs' Exhibit 4, that "he makes guys feel very small," id., that "he makes guys feel threatened for their physical well being," id., and that "he has a . . . habit . . of . . . hitting guys in the . . . privates." Id.

The plaintiffs have also relied upon a Resolution Agreement executed by the School District and the United States Department of Education, Office for Civil Rights.  The document was generated in September 2000 allegedly after an incident involving D.H. and another student, whereby the School District agreed to "continue to provide for the prompt and equitable resolution of complaints alleging disability and sexual harassment," Plaintiffs' Exhibit 6, and to provide "continuing training for all employees dealing with issues of gender/sexual harassment and disability harassment." Id.

Even if such evidence establishes that Castle had actual knowledge of and recognized a risk to R.G. sufficient to satisfy the first prong of the four-prong test, the Court finds the plaintiffs have failed to show a genuine disagreement with regard to the second prong. The undisputed evidence demonstrates that the day after the anonymous telephone call was made, Castle met with both D.H. and D.H.'s mother and advised them that the reported behavior would not be tolerated.  Likewise, the Resolution Agreement was an

6

attempt to correct, rather than to disregard, such problems.

The plaintiffs have contended that Castle should have suspended D.H. or recommended that he be placed in an alternative school. As the Supreme Court, however, has noted, to avoid liability, defendants are not required to "purg[e] their schools of actionable peer harassment or . . . engage in particular disciplinary action." 526 U.S. at 648. "[V]ictims of peer harassment [do not] have a . . . right [under Title IX] to make particular remedial demands." Id. (citation omitted). "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators," id. (citation omitted), and these "administrators . . . [should] continue to enjoy the flexibility they require," id., unless their "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. Title IX does not "require funding recipients to 'remedy' peer harassment." Id. (citation omitted). "On the contrary, [Title IX only requires that] the recipient . . . merely respond to known peer harassment in a manner that is not clearly unreasonable." Id. at 648-49. Based upon the undisputed evidence, the Court finds as a matter of law that Castle's response was not deliberately indifferent and thus, the plaintiffs cannot prevail on a cause of action under Title IX to the extent that it is based upon Castle's knowledge of D.H.'s conduct and his response thereto.

The Court has also considered the School District's liability under the four-prong test outlined in Murrell in connection with other school personnel identified by the plaintiffs since liability under Title IX may attach when the harassment "'takes place while the students are involved in school activities or otherwise under the supervision of school employees.'" Davis, 526 U.S. at 646 (quoting Doe v. University of Illinois, 138 F.3d 661, 653 (7th Cir. 1998)). As the Supreme Court has noted, "Title IX is predicated upon notice to an

'appropriate person,'" <u>Gebser v. Lago Vista Independent School District</u>, 524 U.S. 274, 290 (1998)(citing 20 U.S.C. § 1682), and "[a]n 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." <u>Id</u>. "Where the victim is complaining about a fellow student's action 'during school hours and on school grounds,' teachers may well possess the requisite control necessary to take corrective action to end the discrimination." 186 F.3d at 1248 (citations omitted).

In this connection, during his deposition, R.G. was asked the following questions and he gave the following answers.

"Q.  When [D.H.] . . . did this . . . when you were in the 8th grade and he was in the 9th grade, he didn't do this behavior to you, did he?

A.  No, sir.

Q.  All right.  Where would he do these things?

A.  On the gym floor.

Q.  Okay.

A.  And in the hallways.

Q.  Okay. Would he do it when teachers would have their backs turned?

A.  No, sir.

Q.  He'd do it right in front of their faces?

A.  Yes, sir.

Q.  So is it your testimony under oath that [D.H.] . . . would grab people . . . right in front of a teacher who was sitting there watching him, and . . . where his groin is making physical contact with another boy's rear end?

A.  Yes, sir.

Q.  And what would these teachers do?

A.  Nothing.

Q.  Just sit there and watch it?

A.  Yes, sir."

Deposition of R.G. (October 21, 2004) at p. 51, line 5 to p. 52, line 5.

"Q.  All right.  Were any coaches in the locker room when [D.H.] did this humping on this boy the first day of practice?

A.  Yes.

Q.  Which coach?

A.  All of them. . . .

Q.  They were all standing there in the locker room where this happened?

A.  Yeah.

Q.  Were they watching this?

A.  They had to have been.  It wasn't that big of a locker room.

. . . .

Q.  And they did nothing?

A.  No.

Q.  Said nothing?

A.  Huh-uh."

Id. at p. 119, lines 1-24.

"Q.  The third day [of football practice].  [What happened?]

. . . .

A.  Whenever I was getting dressed, [D.H.] came up behind me and grabbed me and started humping on me.

Q.  What were you wearing?

A. [Gym] shorts [and underwear].

. . . .
Q.  Was he touching you?

A.  Yes.

Q.  With his private parts?

A.  Yes.

Q.  On your rear end?

A.  Yes.

. . . .

Q.  What did he say?

A.  He said, 'I got me a new bitch.'

. . . .

Q.  Did you try to get away?

A.  Yes.  I finally pushed him off of me.

Q.  What was going on with the other people in the locker room?

A.  They were laughing.

Q.  Were the coaches standing right there?

A.  Yes.

Q.  Watching the whole thing?

A.  Yes."

Id. at p. 131, line 17 to p. 134, line 20.

"Q.  After this was over, . . . did you look at a coach . . . or say something to
a coach?

A.  I looked at them.  They were just standing there.

. . . .

A.  They were talking to each other, but they were there looking.  They were looking around, like, talking."

Id. at p. 136, lines 5-14.

R.G. identified the coaches as Lankford, Estep and Brooks.  He identified the teacher as Ms. Armstrong.  The School District Student Handbook ("Handbook") charges all "[t]eachers . . . [with] the responsibility to insure a climate [that is] conducive to the safety and welfare of students . . . ."  Plaintiffs' Exhibit 8, at 8.  The Handbook also grants teachers "the same rights as a parent to control and discipline [a student] . . . during the time the [student] . . . is in attendance or in transit to the . . . classroom presided over by a teacher." Id. at 16; see also 70 O.S. § 6-114 (renumbered 70 O.S. § 100.4 and amended effective November 1, 2004).   Teachers are also authorized to take appropriate disciplinary measures.  Plaintiffs' Exhibit 8, at 16-17.

Based upon the provisions of the Handbook, the Court finds the teachers/coaches are "appropriate persons" whose actions may subject the School District to liability if one or more of the individuals identified by R.G. had actual knowledge of the alleged discrimination and failed to adequately respond.  The Court finds further in light of R.G.'s depositional testimony that a sufficient dispute exists with regard to the knowledge of these individuals.   There is a genuine disagreement about whether one or more school employees had notice of D.H.'s behavior, and particularly, notice of D.H.'s behavior directed at R.G., and yet, though possessed with such knowledge as well as the requisite control and power to take corrective, remedial action, was deliberately indifferent to the

alleged harassment.

The Court further finds sufficient dispute with regard to the remaining two prongs of the four-prong test to defeat the School District's request for summary judgment on this cause of action.  Indeed, the evidence regarding whether D.H.'s behavior "was so severe, pervasive and objectively offensive that it . . . deprived [R.G.] . . . of access to the educational benefits or opportunities provided by . . . [Blanchard High]," 186 F.3d at 1246 (citation omitted), and whether it "had a concrete, negative effect on . . . [R.G.'s] ability to receive an education," id. at 654, is not so one-sided that the School District must prevail as a matter of law.

In their second and third causes of action, labeled "Negligence" and "Negligent Infliction of Emotional Distress," respectively, the Glasgows have complained about certain actions of the School District and the damages allegedly suffered by R.G. as a result thereof.  In particular, the plaintiffs have contended that the School District had an affirmative duty to provide its students a safe premises, that it knew or should have known of the substantial risk of violence posed by D.H. and that it failed to protect R.G. from this risk because it failed inter alia to maintain an appropriate review system of assault and sexual harassment claims, failed to maintain an appropriate screening procedure to identify violent students, failed to properly supervise students on the football field and in school locker rooms, failed to adopt and maintain a policy for the control and discipline of students and failed to maintain a safe environment.

Under the Oklahoma Governmental Tort Claims Act ("Act"), 51 O.S. § 151 et seq., a school district "shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment subject to the limitations and exceptions

12

specified in this [A]ct . . . ."  Id. § 153(A).  The School District has relied upon that exception

in the Act which provides that no liability shall attach for the

> "[p]erformance of or the failure to exercise or perform any act or service
> which is in the discretion of the . . . [school district] or its employees."

Id. § 155(5).

The School District has argued that because it has the discretion to determine what

security measures are necessary and appropriate, section 155(5) exempts it from liability

for a loss resulting from the exercise of that discretion.  In support of its argument, the

School District has relied upon Randell v. Tulsa Independent School District No. 1, 889

P.2d 1264 (Okla. App. 1994), wherein the Oklahoma Court of Appeals in addressing a

challenge to a school's inadequate security policies stated that "[p]rotected discretionary

functions include . . . policy making and planning decisions, although not negligent

performance of the policy."  Id. at 1267 (citations omitted).   Randell is applicable in this

case since the plaintiffs have charged the School District with "fail[ing] to adopt and

maintain a policy for the control and discipline of students that are prone to bully other

students during school,"   Amended Complaint at 8, ¶ 8, and not with the negligent

performance of any school policy.

In Truitt v. Diggs, 611 P.2d 633 (Okla. 1980), the Oklahoma Supreme Court

recognized that a board of education exercises "[a] great deal of discretion . . . in

determining what security measures are needed," id. at 635, and based upon this case law,

the Court finds the decisions of the School District regarding screening and review

procedures and disciplinary policies about which the instant plaintiffs have complained were

judgment calls for which no liability can be imposed.  E.g., Franks v. Union City Public

<u>Schools</u>, 943 P.2d 611 (Okla. 1997).  Accordingly, the Court finds the School District is exempt from liability pursuant to section 155(5) and is therefore entitled to judgment as a matter of law with regard to the plaintiffs' second and third causes of action.

In their fourth cause of action, the Glasgows have asserted a breach of contract claim against the School District. This cause of action is grounded upon Oklahoma's compulsory school attendance laws set forth in article 13, section 4 of the Oklahoma Constitution and title 70, sections 10-105 and 10-106 of the Oklahoma Statutes and upon the provisions of the Handbook.  The plaintiffs have alleged that the School District pursuant to this authority had certain express and implied contractual obligations to provide R.G. an education free from sexual harassment.

The plaintiffs, however, have cited no case law in support of their contention that the state constitutional provision or either of the two statutory provisions that they have cited creates a contractual relationship, express or implied, which the parents and/or students may seek to enforce. The plaintiffs have likewise cited no authority that recognizes that a handbook provided by a public school district, as opposed to one provided by a private institution, creates an enforceable contract between the recipient of that handbook and a school district.  The relationship between students (or their parents) and a public school is not by its nature contractual, and the Court finds that the School District is entitled to summary judgment on this cause of action.

In their fifth cause of action, the Glasgows have sought relief under title 42, section 1983 of the United States Code, and they have contended that the School District interfered with and violated R.G.'s property and liberty interests guaranteed by the fourteenth amendment to the United States Constitution.  The Glasgows have made no

distinction between the procedural and substantive components of the due process clause, but rather have merely alleged in this cause of action that R.G. had a protectible property interest in his continued education pursuant to the state compulsory school attendance laws and a protectible liberty interest to be free from sexual assault and harassment. Despite the Glasgows' failure to identify with more specificity the basis of their alleged fourteenth amendment violation,[3] the Court has examined the plaintiffs' allegations under that case law which addresses the fourteenth amendment's guarantee of substantive due process,  "'[t]he touchstone of . . . [which] is protection of the individual against arbitrary action of government.'" County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998)(quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)).

A school district can be sued under section 1983, but it is subject to liability only for its own official policies or customs.  E.g., Monell v. New York City Department of Social Services, 436 U.S. 658, 691 (1978). Thus, to prevail on this fifth cause of action, the plaintiffs must demonstrate "the existence of a . . . policy or custom, and . . . a direct causal link between the policy or custom and the injury alleged."  Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

In this connection, the Glasgows have contended that the School District's

"policy, practice and custom proximately caused injury to R.G. because . . . the [School District] fail[ed] to maintain an appropriate system of review of

---

[3]In response to the School District's challenge to this cause of action, the Glasgows have relied only upon one case, and in that case, the United States Court of Appeals for the Tenth Circuit addressed liability for sexual harassment under the  equal protection clause, and not the due process clause, of the fourteenth amendment.  See Murrell v. School District No. 1, 186 F.3d 1238, 1249 n.5 (10th Cir. 1999). The applicability of the equal protection clause is not dependent upon the existence of property or liberty interests.  Nevertheless, in deciding the defendant's liability under section 1983, the Court has considered Murrell to the extent it is applicable.

assault claims, and failed to identify conduct by the students which pose substantial risk of violence to other students."

Amended Complaint at 12, ¶ 5.[4]  More particularly in their response, the plaintiffs have alleged that the injuries suffered by R.G. were directly caused by a policy or custom of deliberate indifference to sexual harassment.

As the United States Supreme Court has noted, "[t]he touchstone for determining official policy  [or custom] is distinguishing [the] acts of the [challenged entity] from acts of [its] employees . . . , and thereby making clear that [entity] . . . liability is limited to action for which the entity is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80 (1986). In Murrell v. School District No. 1, 186 F.3d 1238 (10th Cir. 1999), the United States Court of Appeals for the Tenth Circuit held that to prevail against an entity such as a public school district under section 1983,

> "the plaintiff must demonstrate that a state employee's discriminatory actions
> are representative of an official policy or custom of the . . . institution, or are
> taken by an official with final policy making authority."

Id. at 1249 (citation omitted).  The circuit court held that to subject the named entity to liability, the plaintiffs must show either "'a "policy statement . . . or decision officially adopted and promulgated by [that entity's] . . . officers,"'" id. (citations omitted), or "[a]bsent such an official policy, a . . . discriminatory practice . . . 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" Id. (quoting Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996)(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 148 (1970))).

---

[4]To the extent the plaintiffs have argued that a violation of Title IX gives rise to a cause of action under section 1983, such argument must fail. E.g., Seamons v. Snow, 84 F.3d 1226, 1234 n.8 (10th Cir. 1996)(section 1983 action cannot be predicated on violation of Title IX itself).

"[A]cts of sexual harassment by a student directed solely at . . . [one student] do[es] not demonstrate a custom or policy of the School District to be deliberately indifferent to sexual harassment as a general matter," 186 F.3d at 1250, and  the "failure to prevent sexual harassment by a student before it occurs does not violate . . . the [f]ourteenth amendment absent a showing of an institutional policy of indifference." Id. at 1250 n.7. However, "a refusal to remedy known sexual harassment is actionable." Id.

The Court finds the plaintiffs have failed to establish that the actions about which they have complained were taken pursuant to a policy that was officially adopted and promulgated by the School District or are representative of a persistent and widespread discriminatory practice so permanent and well settled that it "constitutes the 'standard operating procedure,'" Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989)(citation omitted), of the School District.

As indicated, the plaintiffs may establish liability under section 1983 on the part of the School District if they demonstrate that the alleged discriminatory actions were taken by an official with final policymaking authority.[5]   In the instant case, the plaintiffs have contended that Castle as well as the coaches and teachers identified by R.G. possessed the requisite policymaking authority.  The Court has examined their  potential liability in turn

_____

[5]Despite the School District's conclusory assertions regarding which officials possess final policymaking authority and the plaintiffs' contention that possession of such authority is a question of fact which cannot be resolved at this stage, the Court finds "'whether a particular official has "final policymaking authority" is a question of state law,' . . . to be resolved by the trial judge before the case is submitted to the jury." Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989)(quoting St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988))(emphasis deleted).  "[T]he trial judge must identify those officials . . . who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.  Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue . . . ." Id. (emphasis deleted).

17

while addressing the theories of liability asserted by the plaintiffs.

"'[S]tate actors are liable only for their own acts, and not the violent acts of third parties.'" Christiansen v. City of Tulsa, 332 F.3d 1270, 1279 (10th Cir. 2003)(quoting Armijo v. Wagon Mound Public Schools, 159 F.3d 1253, 1260 (10th Cir. 1998)).   Accordingly, a school district's "'failure to protect an individual against private violence . . . does not constitute a violation of the [d]ue [p]rocess [c]lause . . . .'" Id. (quoting DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 197 (1989)).

There are, however, two exceptions to this general rule: the "special relationship" doctrine and the "danger creation" theory."  Id. at 1279-80.  The "special relationship" doctrine comes into play "'when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . .'" Armijo, 159 F.3d at 1260 (quoting Liebson v. New Mexico Corrections Department, 73 F.3d 274, 276 (10th Cir. 1996))(other citations omitted).   The plaintiffs have cited no case which holds that Oklahoma's compulsory school attendance laws create a special relationship sufficient to hold the School District liable in this case.  Instead, case law teaches that  "'compulsory attendance laws do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school.'"  Graham v. Independent School District No. I-89, 22 F.3d 991, 994 (10th Cir. 1994)(quoting Maldonado v. Josey, 975 F.2d 727, 732 (10th Cir. 1992))(other citations omitted); e.g., Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996).  Thus, in the absence of a special relationship between R.G. and the School District, even if, as the  plaintiffs have alleged, the School District possessed through its authorized employees "specific information which would mandate action[,] . . . the protections of the [d]ue [p]rocess [c]lause," 22 F.3d at 995, are not invoked.

Accordingly, the Glasgows cannot establish a violation of substantive due process under this exception.

The second exception to the general rule, as indicated, is the "danger creation" theory.  Under this theory, a school district "'can be liable for the acts of third parties where [it] "created the danger" that caused the harm.'" Christiansen, 332 F.3d at 1281 (quoting Seamons, 84 F.3d at 1236).  It is not enough under this theory for the plaintiffs to show that the School District may have been aware of the danger confronting R.G.; a plaintiff must show that the School District played a part in the creation of the danger or rendered R.G. more vulnerable to the danger.

The Tenth Circuit has devised a six-part test to be employed when considering danger creation claims:

> "To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking."

Gonzales v. City of Castle Rock, 307 F.3d 1258, 1263 (10th Cir. 2002).

To the extent the plaintiffs have grounded the School District's liability under section 1983 on their allegation that Castle as principal possessed final policymaking authority and that he discriminated against R.G. because he had actual notice of D.H.'s behavior and was deliberately indifferent to, or tacitly approved of, D.H.'s behavior, the Court finds the plaintiffs cannot prevail.

First, the plaintiffs have contended that R.G. observed D.H. perform "humping

motions" behind other students.   The evidence is clear that these students complained to R.G. and to each other about D.H., but that they did not complain to Castle.

Furthermore, the Court finds that Castle as a final policymaker was not deliberately indifferent to R.G.'s rights and did not tacitly approve of D.H.'s behavior.  Each time Castle was advised of D.H.'s offensive behavior either through the anonymous telephone call to the school's "Safe Call Helpline" or through information obtained from the Resolution Agreement or from R.G in September 2002, Castle reacted.

Although the plaintiffs, as indicated, have complained that Castle should have suspended or expelled D.H., the fourteenth amendment's due process clause "'is not a guarantee against incorrect or ill-advised [government] decisions.'" Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995)(quoting Collins v. City of Harker Heights, 503 U.S. 115,129 (1992)). Rather, "[t]he danger creation theory . . . focuses on the affirmative actions of the state in placing the plaintiff in harm's way."  Currier v. Doran, 242 F.3d 905, 919 (10th Cir. 2001).  A failure to act that does not decrease or eliminate a pre-existing danger is not affirmative conduct, and although the parties may disagree about whether Castle's "efforts amounted to the correct response, [his efforts] reflect that [he] . . . did not intend to harm [R.G.] . . . or unreasonably . . . place him at risk of harm." Seamons, 84 F.3d at 1236. Indeed, the plaintiffs have not presented any evidence that demonstrates that Castle's conduct, even if it did not reduce the danger posed by D.H., created or enhanced that danger or put R.G. "'at substantial risk of serious, immediate, and proximate harm.'" Christiansen, 332 F.3d at 1281 (quoting Gonzales, 307 F.3d at 1263).  Furthermore, the Court finds Castle's conduct about which the Glasgows have complained fails to satisfy the "shock the conscious" standard; such conduct does not "demonstrate a degree of

outrageousness and a magnitude of potential or actual harm that is truly conscious shocking." Ulhrig, 64 F.3d at 574.[6]  Accordingly, the Court finds Castle's actions taken in his official capacity as principal and final policymaker do not give rise in this instance to liability on the part of the School District.

The plaintiffs have also contended that the coaches and teachers identified by R.G. possess final policymaking authority so that their actions may subject the School District to liability under section 1983.  "'[W]hether an [individual] . . . had final policymaking authority is a question of state law,'" St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986))(footnote omitted), and the plaintiffs, who bear the burden of showing that the discretionary disciplinary decisions of these individuals may fairly be said to represent official policy sufficient to hold the School District liable, have failed to show a genuine dispute about their authority.

Pursuant to the School District's Handbook, Blanchard High teachers are authorized "to insure a climate conducive to the safety and welfare of students," Plaintiffs' Exhibit 8, at 8, and are charged with the control and discipline of the students while the students attend school. Id. at 16-19.  The Handbook outlines the behaviors subject to disciplinary action, id. at 16-17, but  grants teachers the ability to discipline students for violations of unlisted school rules and regulations.  Id. at 17.  The Handbook also outlines the disciplinary  methods to be imposed.

---

[6]The Court is mindful that  this "constitutional concept of conscience shocking," County of Sacramento v. Lewis, 523 U.S. 833,  848 (1998), is not "subject to mechanical application . . . ." Id. at 850.  Conduct "that shocks in one environment may not be so patently egregious in another, and . . . [the Court's] concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Id.

If is not enough to show that the Handbook granted the teachers the authority to make discretionary decisions about D.H. and any disciplinary action to which he might be subjected.  The plaintiffs must also demonstrate that these teachers were responsible under state law for making policy regarding the discipline to be imposed, and under Oklahoma law, the final policymaking authority rests with the School District's Board of Education.  E.g., 70 O.S. § 5-117.  While the Handbook enumerates the responsibilities with which the teachers are charged and provides that teachers may exercise decision-making authority  in the area of discipline, the teachers even in that area are constrained by, and must follow,  the guidelines and policies established by the School District.  Thus, the Court finds the teachers did not have the requisite final policymaking authority to hold the School District accountable for their actions for purposes of section 1983.  Accordingly, the School District is entitled to summary judgment on the plaintiffs' fifth cause of action.

In their sixth cause of action, the Glasgows have sought relief under Title II of the Americans With Disabilities Act of 1990 ("Title II" or "ADA"), 42 U.S.C. § 12132.  This statute provides that

> "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

Id.

To prevail on a cause of action under section 12132, a plaintiff must establish the following essential elements:

> "(1) that he is a qualified individual with a disability;
>
> (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise

discriminated against by the public entity; and

(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."

Tyler v. City of Manhattan, 857 F. Supp. 800, 817 (D. Kan. 1994)(citations omitted).

The plaintiffs have advanced two theories in support of their contention that the School District violated Title II.  They have argued first that R.G.'s disability, which is undisputed, hindered his ability to understand football plays, that the football coaches ignored his requests for help and that R.G. was therefore rarely permitted to participate in the school-sponsored football program and thus, denied the benefits of that program.

The plaintiffs have next argued that friends of D.H. taunted R.G., that the School District failed to prevent this harassment and because R.G. was therefore forced to quit the football team (and ultimately, Blanchard High), he was discriminated against and denied the benefits of a school-sponsored activity.

The School District has argued that the plaintiffs cannot pursue this cause of action under either theory because they have failed to exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  The plaintiffs have responded that exhaustion is not required under Title II and thus, the IDEA's exhaustion requirements are not applicable.

The IDEA "was designed 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs.'" Cudjoe v. Independent School District No. 12, 297 F.3d 1058, 1064 (10th Cir. 2002)(quoting 20 U.S.C. § 1400(d)(1)(A))(footnote omitted).  It "provides a 'carefully structured procedure for administrative remedies,' which

23

encourages parents to seek relief quickly when [a problem] . . . occurs and 'allows the educational system to bring its expertise to bear in correcting its own mistakes.'" Id. at 1065 (quoting Polera v. Board of Education of the Newburgh Enlarged City School District, 288 F.3d 478, 486 (2d Cir. 2002)).

Although Title II itself, as the plaintiffs have argued, does not require persons with disabilities to exhaust administrative remedies before commencing suit, e.g., 28 C.F.R. Part 35, App. A, Subpart F, the IDEA expressly provides that its exhaustion requirement shall apply to suits brought pursuant to the ADA.  Title 20, section 1415(l) of the United States Code states that

> "[n]othing in . . . [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the . . . [ADA] . . . or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under . . . [the IDEA], the procedures . . . [set forth in] this section shall be exhausted to the same extent as would be required had the action been brought under . . . [the IDEA]."

20 U.S.C. § 1415(l).

The plaintiffs have cited no authority which would permit their claims brought under Title II to bypass IDEA's exhaustion requirement. They have not argued that their Title II claims do not seek "relief that is also available under . . . [the IDEA]," id., or argued that any exception to this exhaustion requirement applies.  Absent such argument and authority, the Court finds the School District is entitled to judgment as a matter of law due to the plaintiffs' failure to exhaust their administrative remedies as to this sixth cause of action.

In their final cause of action, the Glasgows have alleged that the School District conspired with defendant Dwight Myers and Castle to violate R.G.'s civil rights. In light of the plaintiffs' request that this cause of action be dismissed without prejudice, the Court has

not considered the School District's entitlement to summary judgment on such claim.

Based upon the foregoing, the Court finds the School District is entitled to judgment as a matter of law on all causes of action asserted against it save the plaintiffs' cause of action under Title IX and  the plaintiffs' cause of action for conspiracy, but finds, in connection with the latter, that the School District is entitled to dismissal of that claim. Accordingly, the Court

(1) GRANTS the Motion for Summary Judgment filed on April 1, 2005, by the School District as to the plaintiffs' second, third, fourth, fifth and sixth causes of action asserted in the amended complaint;

(2) DISMISSES without prejudice the plaintiffs' seventh cause of action asserted against this defendant; and

(3) DENIES said Motion as to the plaintiffs' first cause of action.

**IT IS SO ORDERED this 26th day of May, 2005.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE